UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
:
KATIE DIAZ,                                                     :
:
                                     Plaintiff,                 :
:                   1:13-cv-7813-GHW
                    -against-                                   :
:                   MEMORANDUM OPINION
:                       AND ORDER
AMERICAN AIRLINES, INC.,                                        :
:
                                     Defendant.                 :
:
----------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

 While returning home from vacation in Puerto Rico, Ms. Katie Diaz had the misfortune to

slip and fall in front of an American Airlines ticket counter.  Ms. Diaz sued American Airlines for

negligence—after all, the accident occurred near an American Airlines ticket counter, in view of

signs with that company's name.  However, as the undisputed facts elicited during discovery

established, American Airlines did not operate or control the area where Ms. Diaz fell; it was a

common use area, maintained by the terminal's operator.  As a result, American Airlines did not owe

the plaintiff a legal duty, and may not be held liable for the plaintiff's injuries.  For the reasons set

forth below, the Court grants summary judgment for the defendant.

## I. BACKGROUND

*The Accident*

 Ms. Diaz' accident occurred on a Sunday, October 7, 2012, at the Luis Muñoz Marín

International Airport in San Juan, Puerto Rico.  Plaintiff's 56.1 Statement, Docket No. 33 ("P56.1")

at ¶ 1.  Ms. Diaz had arrived in Puerto Rico several days before for a short vacation to celebrate her

birthday.  Deposition of Katie Diaz, Docket No. 29-3 ("Diaz Examination") at 56.  On the day of

the accident, she was on her way home.  She planned to fly from Puerto Rico home to New York on

an American Airlines flight.  P56.1 at ¶ 2.

Ms. Diaz' return trip began uneventfully:  she printed her boarding pass from a computer kiosk, checked her luggage at the American Airlines ticket counter, and passed through the security checkpoint to the gate from which her flight was scheduled to depart.  P56.1 at ¶¶ 3-4.  After she arrived at the gate, however, Ms. Diaz heard her name paged over the public address system.  P56.1 at ¶ 4.  She asked several people where to go and, eventually, was directed back to the security area, where a Transportation Security Administration agent told her that he was the person who had paged her.  P56.1 at ¶¶ 4-5.

The TSA agent instructed Ms. Diaz to follow him, and they passed back through the security checkpoint to an area in the main terminal near the American Airlines ticket counter.  P56.1 at ¶ 5.  As the TSA agent went behind the ticket counter, Ms. Diaz rounded a corner to position herself in front of the ticket counter.  *Id.*  Then, suddenly, she slipped and fell to the floor.  *Id.*

At the time Ms. Diaz slipped, she had been looking up and straight ahead.  P56.1 at ¶¶ 5-6.  To her immediate left was the ticket counter, which extended down in front of her, and to her right was a Best Western hotel.  P56.1 at ¶ 6.  When she fell, she did not come into contact with the counter, which was approximately an arm's length away.  *Id.*  The plaintiff did not see any debris, substance, or defect on the floor immediately prior to her fall.  P56.1 at ¶ 7.  She testified that she could see well and that it was "bright," but she noted that she could not have observed anything on the floor where she fell because she was turning a corner.  *Id.*

As Ms. Diaz sat on the floor after her fall, she observed a clear puddle nearby, which, she testified, she assumed was water.  P56.1 at ¶¶ 8-9.  Ms. Diaz did not recall how far the water was located from where she was seated.  P56.1 at ¶ 9.  The puddle "was approximately the size of half a cup," and "its diameter measured two widths of a hand."  P56.1 at ¶ 8.  The plaintiff was unaware of how long the water had been present or of what caused the puddle to be on the floor.  P56.1 at ¶ 9.

She did not touch it.  *Id.*  There were no footprints around the water, nor were there any signs or warnings in the area.  *Id.*

Ms. Diaz did not see any cleaning or maintenance personnel or cleaning materials at the time of the incident.  Immediately following her fall, however, she witnessed a manager direct a cleaning lady to mop up the water.  P56.1 at ¶ 6.  Ms. Diaz has no evidence that the manager worked for the airline, as opposed to the airport operator.  *Id.*  Previously, during the five to ten minutes she had spent at the ticket counter to check her luggage, Ms. Diaz had not observed any trash or water on the floor, nor had she observed any cleaners, warning signs, mops, buckets, or anything unusual in the vicinity of the ticket counter.  P56.1 at ¶ 3.

*The Terminal and the Defendant's Leasehold*

Ms. Diaz describes the Luis Muñoz Marín International Airport in San Juan, Puerto Rico as "well, one big terminal with different airlines."  Diaz Examination at 57:12-13.  A number of airlines, including American Airlines, Delta, U.S. Airways, and Cape Air, operate ticket counters next to each other in the airport.  Deposition of Lecaldo Sylvester, Docket No. 29-5 ("Sylvester Deposition") at 16:23-17:9.  The airlines lease the ticket counters and the space behind the ticket counters.  *Id.* at 18:15-21.  Any area that is not leased exclusively by the airlines is common use space.  *Id.* at 18:9-14.  The area in front of the ticket counter, where Ms. Diaz fell, was not within American Airlines' leasehold.  P56.1 at ¶ 1.  Instead, it was part of the terminal's common use area.  *Id.*

The common use areas of the airport are operated by the Puerto Rico Ports Authority (the "PRPA").  P56.1 at ¶ 1.  The PRPA is responsible for maintenance of the common use areas of the airport.  Sylvester Deposition at 18:9-14.  The PRPA had retained a cleaning company, Perfect Cleaning Service, to maintain the area where Ms. Diaz fell.  P56.1 at ¶ 1.  Conversely, American Airlines did not hire cleaning companies to clean the various common use areas in the airport, including the area where Ms. Diaz fell.  P56.1 at ¶ 13.

3

Mr. Lecaldo Sylvester, the Manager for Corporate Real Estate Properties for the Caribbean at American Airlines, provided uncontested testimony that when there is an incident at the airport, anyone who learns of the incident may contact the PRPA to initiate a response. P56.1 at ¶¶ 12, 14. If an incident occurs in a common use area, it is handled by the PRPA. P56.1 at ¶ 14. American Airlines is not notified by the PRPA regarding incidents that occur in the airport, nor does it receive records of such incidents. *Id.*

Ms. Diaz highlights two undisputed facts in support of her claim. First, she notes that American Airlines signs were present behind and above the ticket counter. P56.1 at ¶ 1. Second, she observes that there were no signs indicating that the PRPA cleaned, maintained, or controlled that area of the airport. *Id.* As the Court finds below, however, neither of these facts supports Ms. Diaz' claim: the fact that the defendant's signs were visible from the area where she fell does not establish that the defendant had a legal duty with respect to the relevant area. And the fact that the PRPA did not prominently identify itself as the owner and operator of the area where the accident occurred does not justify imposing liability on the defendant here.

## II.     PROCEDURAL HISTORY

Ms. Diaz commenced this action on October 3, 2013 in the Supreme Court of the State of New York, Bronx County, alleging state law claims of negligence. American Airlines removed the action to this Court on November 4, 2013 pursuant to 27 U.S.C. §§ 1441 and 1332. The case was reassigned from Judge Koeltl to the undersigned on April 15, 2014.

After the parties completed fact discovery, the defendant moved for summary judgment on October 17, 2014. The parties then participated in a telephone conference before the Court on October 21, 2014, during which the Court instructed the defendant to amend its motion for summary judgment to address the issue of choice of law. The defendant submitted a new summary judgment motion on October 29, 2014.

The plaintiff filed an opposition to the defendant's motion on November 9, 2014. The defendant filed a reply in support of its motion on November 14, 2014. Because the plaintiff submitted her Rule 56.1 Counter Statement of Facts after the date of the defendant's reply, the Court permitted the defendant to file a sur-reply, which the defendant did on December 23, 2014.

### III.    LEGAL STANDARD

The defendant is entitled to summary judgment if it can show that "there is no genuine issue as to any material fact and that [defendant is] entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To defeat a motion for summary judgment, the plaintiff "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations and internal quotations omitted). Nor will wholly implausible alleged facts or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (citing *Matsushita*, 475 U.S. at 585-86). The issue of fact must be genuine—plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job "is not to weigh the

evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). Rather, the Court must decide "whether a rational juror could find in favor of the non-moving party." *Id.*

## IV.   DISCUSSION

### a.   Choice of Law

A federal court sitting in diversity must apply the choice of law rules of the forum state. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012). Under New York choice-of-law rules, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993). "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." *Licci*, 672 F.3d at 157. If, however, an actual conflict exists, then "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied and the only facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197 (1985) (quoting *Miller v. Miller*, 22 N.Y.2d 15-16 (1968)) (internal quotations and alterations omitted).

"In tort-law disputes, interest analysis distinguishes between two sets of rules: conduct-regulating rules and loss-allocating rules." *Licci*, 672 F.3d at 158. "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993). Thus, "New York courts apply the law of the place where the tort occurred with regard to 'conduct regulating' rules, including the duty of care." *Rochford v. Woodloch Pines, Inc.*, 824 F. Supp. 2d 343, 349 (E.D.N.Y. 2011).

"However, where the parties have agreed to the application of the forum law, their consent

concludes the choice of law inquiry." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).  If "[t]he parties' briefs assume that New York substantive law governs the issues . . . such implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)); *see also Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 323 (S.D.N.Y. 2014) (collecting cases).  "[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984).

The parties' briefs both rely on and indicate their assent to the application of New York law. The Court has not identified a strong countervailing public policy.  Therefore, the Court will apply New York law to adjudicate the plaintiff's negligence claim.

### b.  Merits Analysis

"To establish a prima facie case of negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (quoting *Solomon by Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)).

The threshold question is whether American Airlines owed a duty of care to Ms. Diaz.  "The existence and extent of a duty is a question of law" that may properly be resolved in a motion for summary judgment. *Alnashmi v. Certified Analytical Grp., Inc.*, 929 N.Y.S.2d 620, 623 (2d Dep't 2011) (collecting cases).

The plaintiff argues American Airlines owed a duty of care to the plaintiff under the theories of premises liability and common carrier liability.  Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Docket No. 31 ("Opposition") at 8-12.  Neither theory, however, supports the conclusion that American Airlines owed a duty to the plaintiff

because the accident occurred in a common use area of the airport outside of the control of American Airlines.

###### i. Premises Liability

"As a general rule, liability for a dangerous or defective condition on real property must be predicated upon ownership, occupancy, control, or special use of that property." *Suero-Sosa v. Cardona*, 977 N.Y.S.2d 61, 63 (2d Dep't 2013). "The existence of one or more of these elements is sufficient to give rise to a duty to exercise reasonable care." *Quick v. G.G.'s Pizza & Pasta, Inc.*, 861 N.Y.S.2d 762, 763 (2d Dep't 2008) (quoting *Turrisi v. Ponderosa Inc.*, 578 N.Y.S.2d 724, 726 (3d Dep't 1992)). "Where none of these factors is present, a party cannot be held liable for injuries caused by a dangerous or a defective condition." *Suero-Sosa*, 977 N.Y.S.2d at 63. Thus, New York courts routinely find that a defendant does not owe a plaintiff a duty of care in cases in which a defendant does not own, operate, maintain or control the premises where an accident occurred. *See, e.g., Jackson v. Bd. of Educ. of City of New York*, 812 N.Y.S.2d 91, 94 (1st Dep't 2006); *Lopez v. Allied Amusement Shows, Inc.*, 921 N.Y.S.2d 231, 232 (1st Dep't 2011); *Gibbs v. Port Auth. of New York*, 794 N.Y.S.2d 320, 322 (1st Dep't 2005).

The plaintiff argues, as she must, that "there exists a question of fact as to whether the specific area in which [the plaintiff] fell was controlled or occupied by American Airlines." Opposition at 12. But the plaintiff points to no evidence to support this argument. Rather, the plaintiff admits that the area where Ms. Diaz fell is not in American Airlines' leasehold, and that the area was solely maintained by the PRPA, which retained its own cleaning company to service the area.

That Ms. Diaz fell *near* an area occupied or controlled by American Airlines does not establish the existence of a triable issue of fact with respect to American Airlines' duty to maintain or clean the area where the plaintiff's injury occurred. *See Raffile v. Tower Air, Inc.*, 695 N.Y.S.2d 116,

117 (2d Dep't 1999) (holding that the defendant airline made a prima facie showing of entitlement to summary judgment where the airline had established that, as one of several airlines leasing portions of the terminal, it did not have the exclusive right to possess or control a common area). In a similar case involving another slip-and-fall at Luis Muñoz Marín International Airport, the court explained: "Although Plaintiff may have been in an area that she understands corresponds to American Airlines, it would be speculative to allege, without more context specific facts, that American Airlines is responsible for Plaintiff's slip and fall." *Santiago v. Am. Airlines, Inc.*, 840 F. Supp. 2d 500, 505-06 (D.P.R. 2012). Here, in fact, there *are* context specific facts, uncontested by the plaintiff, that affirmatively show American Airlines was not responsible for the common use area where Ms. Diaz fell.

The Court rejects the plaintiff's argument that "public policy dictates that . . . [the defendant] should be held responsible for accidents that occur on property that is *apparently* owned by them." Opposition at 11 (emphasis added). As the defendant cogently argues, "it is irrelevant by whom the plaintiff 'thought' the area was controlled until she opted to bring suit." Reply Brief in Support of Defendant's Motion for Summary Judgment, Docket No. 32 ("Reply") at 7. In support of her position, the plaintiff points to the American Airlines signs in the area of the accident, and argues that "[n]either plaintiff, nor a reasonable person . . . would be able to ascertain that liability did not belong to American Airlines, but rather to an unidentified entity." Opposition at 12. Yet through discovery, the parties were, indeed, able to ascertain that the PRPA exclusively maintained the area. The plaintiff encourages the Court to view the defendant's disclaimer of liability on the basis that they did not control the area as a "technicality." Opposition at 11. But it is a well-established rule in New York that "liability for a dangerous or defective condition on real property must be predicated upon ownership, occupancy, control, or special use of that property," rather than the plaintiff's initial belief about who owned and operated the area where she fell. *See, e.g.*, *Suero-Sosa*, 977

9

N.Y.S.2d at 63 (stating rule).  This rule is not a technicality.

The Court cannot expand the well-established scope of tort liability in New York.  The plaintiff apparently failed to conduct a basic investigation before filing suit, and failed even to attempt to join the PRPA to this action after learning of its role in the operation of the terminal.  The plaintiff had ample opportunity to investigate the circumstances of her accident to identify the proper defendant before filing suit, or thereafter.  The plaintiff's failure to identify the right responsible party to sue does not justify the expansion of tort doctrine, and the imposition of liability on an innocent.

The doctrine of special use also does not authorize imposing liability on the defendant in this case.  "The special use exception is reserved for situations where a landowner whose property abuts a public street or sidewalk derives a special benefit from that property unrelated to the public use, and is therefore required to maintain a portion of that property."  *Poirier v. City of Schenectady*, 85 N.Y.2d 310, 315 (1995).  "When considering the doctrine, New York courts have consistently required that '[b]efore liability can be imposed, the sidewalk must be constructed in a special manner' for the benefit of the abutting landowner."  *Williams v. KFC Nat. Mgmt. Co.*, 391 F.3d 411, 419 (2d Cir. 2004) (quoting *Kiernan v. Thompson*, 525 N.Y.S.2d 380, 382 (3d Dep't 1988).  "Cases applying the doctrine have typically involved the installation of some object in the sidewalk or a variance in the construction of the sidewalk intended specifically to benefit the adjacent owner."  *Id.*

The plaintiff does not point to any evidence of special use.  The fact that American Airlines customers traversed the common use area to interact with American Airlines employees at the ticket counter does not, alone, constitute a special use.  *See, e.g.*, *Tortora v. Pearl Foods, Inc.*, 606 N.Y.S.2d 235, 236 (1st Dep't 1994) ("The fact that patrons of the defendant's establishment formed a line on the sidewalk while awaiting entrance did not establish such special use."); *Ruffino v. New York City Transit Auth.*, 865 N.Y.S.2d 674, 675 (2d Dep't 2008) (holding that customers' use of a boardwalk

leading to and from defendant's subway station was not a special benefit giving rise to a special use).
In sum, the doctrine of special use does not apply to this case.

### ii.   Common Carrier Liability

The plaintiff also argues that American Airlines had a duty as a common carrier "to guarantee the safety of its passengers even before they get on the plane," "which is when Plaintiff got into her accident." Opposition at 11. It is true that the duty of a common carrier with respect to its passengers "requires not only that it keep the transportation vehicle safe, but also that it maintain a safe means of ingress and egress for the use of its passengers." *Bingham v. New York City Transit Auth.*, 864 N.E.2d 49, 51 (2007). In *Schlessinger v. Manhattan Ry. Co.*, the court held that this duty "applies not only to such approaches as may have been constructed and owned by the [common carrier], but to those constructed and owned by other persons, if constantly and notoriously used by passengers as a means of approach." 49 Misc. 504, 505, 98 N.Y.S. 840, 841 (App. Term 1906). In *Bingham*, however, the Court of Appeals concluded that, "the *Schlessinger* rule should be retained, *at least as applied to areas that serve primarily for ingress and egress to a subway or other similar station that is served by a single carrier*," and declined to extend this duty of care to "common areas in a multi-carrier facility." 864 N.E.2d at 52 (emphasis added).

Accordingly, the Court cannot find that American Airlines' duty as a common carrier extended to the area where the plaintiff slipped and fell. *See Ruffino*, 865 N.Y.S.2d at 676 ("[T]he subject boardwalk, which is located between a Long Island Rail Road station and a NYCTA subway station, is more akin to a common area in a multi-carrier facility, to which the duty of care as set forth by the Court of Appeals in *Bingham* has not been extended."). Even if the Court considered the area in front of the American Airlines ticket counter in the main area of the terminal a "means of approach" to a platform or vehicle, the undisputed evidence establishes that it was a common area in a multi-carrier facility.

Finally, even if the Court were inclined to extend American Airlines' common carrier duty to the common use area near its ticket counter, the plaintiff does not point to any evidence that could establish that the defendant breached such a duty. "To impose liability upon a defendant in a trip-and-fall action, there must be evidence that a dangerous or defective condition existed, and that the defendant either created the condition or had actual or constructive notice of it." *Dennehy-Murphy v. Nor-Topia Serv. Ctr., Inc.*, 876 N.Y.S.2d 512, 513 (2d Dep't 2009); *see also Castellanos v. Target Dep't Stores, Inc.*, No. 12-cv-2775 (GWG), 2013 WL 4017166, at *4 (S.D.N.Y. Aug. 7, 2013). The plaintiff argues that there is a question of fact as to whether the defendant had constructive notice of the condition that caused her to slip and fall. Specifically, the plaintiff argues that "[i]n order to prevail on a motion for summary judgment, the Defendant cannot simply rely on Plaintiff's inability to identify the length of time the dangerous condition existed." Opposition at 13. Instead, she would impose on the defendant an obligation to come forward with specific facts to refute the plaintiff's allegations of knowledge or notice.

To support her argument, the plaintiff cites to *Castellanos*, in which Judge Gorenstein wrote that the plaintiff "is correct that on summary judgment in a slip-and-fall case, New York courts require a defendant arguing lack of notice to present evidence that it neither created nor had notice of the dangerous condition." 2013 WL 4017166, at *7. The *Castellanos* court continues, however, to explain—in the very next sentence—that "because the evidentiary burden that the parties bear in a summary judgment motion is procedural, the federal standard controls here. Thus, case law recognizes that New York's burden-shifting standard requiring defendant to provide proof of absence of notice does not apply in a federal diversity case." *Id.* This is a federal diversity case. The plaintiff failed to present evidence that the defendant created or had notice of the dangerous condition. Therefore, summary judgment is appropriate.

## V.     CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted.  The

Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: July 23, 2015
       New York, New York

_____
GREGORY H. WOODS
United States District Judge